## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MATTHEW MULLEN,<br><br>              Plaintiff,<br>     v.<br><br>ASTRAZENECA<br>PHARMACEUTICALS, LP<br><br>              Defendant. | Case No.:<br><br>**Jury Trial Demanded** |

## COMPLAINT

Plaintiff Matthew Mullen ("Mullen" or "Plaintiff") brings this complaint against AstraZeneca Pharmaceuticals, LP ("AstraZeneca" or "Defendant") and alleges as follows:

## NATURE OF THE ACTION

1. This is an action for religious discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-2 *et seq.* Moreover, this Honorable Court has jurisdiction over Plaintiff's state law claims to the extent that he pleads them pursuant to 28 U.S.C. §1367.

## THE PARTIES

2. The Plaintiff is a citizen of the Commonwealth of Pennsylvania.

3. The Defendant is a Delaware corporation doing business in the Commonwealth of Pennsylvania with a principal place of business as 3600 Marshall Lane, Bensalem, PA 19020.

## JURISDICTION AND VENUE

4. This Court has original jurisdiction of this action pursuant to 28 U.S.C. §1331 as one arising under laws of the United States. *See* 28 U.S.C. §1331.

5. Venue is proper in this Court under 42 U.S.C. § 2000e-5(f)(3) because the "unlawful employment practice[s]" giving rise to this lawsuit took place within this district.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

6. All conditions precedent to the filing of Plaintiff's claims under Title VII and the Plaintiff's Pennsylvania Human Relations Act ("PHRA") have been performed or have occurred. Namely, the Plaintiff filed a timely charge of religious discrimination with the U.S. Equal Employment Opportunity Commissions ("EEOC") as dual filed with the Pennsylvania Human Relations Commission ("PHRC") docketed as 530-2022-03770 and at the PHRC as 202200446. The Plaintiff has fully exhausted his administrative remedies as to both his federal and state claims (see **Exhibit A**).

## FACTUAL BACKGROUND

7. Plaintiff worked with the Defendant from December 2004 to April 29, 2022, when Plaintiff was terminated. His position upon termination was Senior Business Relationship Manager, IT Market Access. During his employment, Plaintiff was never formerly disciplined.

8. On or about February 22, 2022, Plaintiff completed Defendant's Religious Reasonable Accommodation Request Form to seek an exemption from the COVID-19 Vaccine after receiving a notice from the Defendant which stated that all employees must take the vaccine unless they were exempted due to religion or disability.

9. Since the beginning of the Pandemic, Plaintiff had worked remotely and when he was in the office he followed the Defendants protocol's for weekly testing.

10. On or about March 21, 2022, Defendant requested additional information from Plaintiff.

11. On or about March 25, 2022, Plaintiff provided additional answers to Defendant's additional questions about his religious beliefs.

12. On or about March 31, 2022 – Defendant denied Plaintiff's request to receive accommodation from the vaccine claiming that the Plaintiff failed to articulate a sincerely held religious belief.

13. On or about April 20, 2022, Plaintiff sent the following email to Defendant:

Hi All,

I wanted to honor our Speak Up Culture and let you know that I would like to keep my job and that I have loved working at AZ over the last 17+ years. I am willing to continue under the accommodations that have been set up since Covid started such as remote working and testing weekly while on site. As Wilmington SHE is aware I did have Covid and they asked me not to test for 12 weeks which I did not, also while having Covid I did not miss a day of work as I worked remotely in order to ensure I did not get anyone sick just like I would do with any other

illness. I have been compliant with this and masking over the last 2+ years and have been able to do my role successfully, even getting high ratings on one of my yearly reviews. I feel strongly that my sincerely held religious beliefs should not preclude me from working at AZ like they have not the previous 17+ years and I should not lose my severance, health insurance, and LTI. It truly feels that the Diversity and Inclusion that AZ proudly proclaims as a core value does not include myself and my religion. I am asking that you reconsider this policy and appreciate your time and consideration. If there is other accommodations that may work, besides going against my religious beliefs, I am willing to discuss and entertain those ideas.

Thank you,

-Matt

14. On or about April 20, 2022, Defendant answered Plaintiff, in part, as follows:

As communicated to you and your manager last month, your request for an accommodation related to AstraZeneca's vaccination mandate was denied following careful consideration. In order to continue your employment at AstraZeneca, you must become fully vaccinated against COVID-19. This means you must receive at least your first vaccination dose of a two-dose series or a single-dose vaccination and upload documentation in Workday by April 22, 2022*. If you choose not to get vaccinated, you may remain an active employee with AstraZeneca until April 29, 2022, at which point your employment will be terminated without severance.

15. Accordingly, April 22, 2022, was the Defendant's imposed deadline for Plaintiff to receive the vaccine.

16. There were numerous other employees of various faiths that received exemptions for the COVID-19 vaccine.

17. On or about April 29, 2022, Defendant terminated Plaintiff's employment.

18. On or about August 1, 2022, Plaintiff started working as Digital Lead –
    Market Access US for Bayer at a reduced salary.

19. Plaintiff also now receives a reduced bonus package of $13,000 compared to
    the $80,000 he was receiving while employed with the Defendant.

20. Plaintiff lost approximately $90,000 in stock which had not vested at the time
    Defendant terminated his position.

21. Plaintiff only receives a 5% 401K match on 7% at Bayer compared to the 6%
    match on 6% at AstraZeneca plus they had given the Plaintiff another 6%
    match since Plaintiff was there so long. Plaintiff now only receives an
    additional 5% from Bayer which vests every four years.

22. Plaintiff now drives approximately three (3) hours every other week to Bayer
    and now must pay tolls. This has caused Plaintiff much higher stress as it is
    highways and traffic compared to no tolls and back roads which he used to
    travel while working with Defendant.

23. Plaintiff may have to relocated to New Jersey where house prices and taxes
    are 3-4 times what they are where he now lives, plus moving expenses. (A
    similar house with similar land would cost $1.5M compared to $400,000 –
    $500,000.

24. Plaintiff, as the main breadwinner in his household, also experienced stress
    over the months in which he was unemployed. His wife only works part-time

and makes significantly less than he does.

25. Further, Plaintiff had to pay out of pocket for him and his family's health insurance while he was unemployed.

26. Plaintiff's professional career and reputation have also been impaired.

## **FAILURE TO ACCOMMODATE RELIGIOUS BELIEFS**

27. Defendant's Religious Reasonable Accommodation Request Form contains the following statement:

AstraZeneca (the "Company") takes seriously its obligations to provide appropriate reasonable accommodation to qualified persons whose sincerely held religious beliefs prohibit them from getting a COVID-19 vaccine. Completion of this form is the first step in an interactive process between you and AstraZeneca to determine whether you are qualified for a reasonable accommodation and further whether there are any available accommodations that would enable you to perform your job (or enjoy equal access to benefits and privileges of employment) and meet our operational and safety needs. Please answer all questions to the best of your ability. Failure to answer each question may impact AstraZeneca's ability to conduct the review necessary to approve your request. After you submit this form, a representative from Human Resources will reach out to you. As part of the interactive process, you may be required to provide additional information regarding your request. Further, any misinformation or knowingly false information provided as part of your request may lead to you being subject to disciplinary action up to and including separation of employment.

28. The questions posed to Plaintiff (italicized), and Plaintiffs answers, are as follows:

a. *Please describe the nature of your objection(s) to the Company's COVID-19 vaccination requirement.*

After much time spent praying about this, it is my deeply and sincerely held religious belief that God will and has protected me in the area of Covid.

b. *Describe the basis of the sincerely held religious belief that requires accommodation.*

The bible tell us that we should take our problems and questions to God through prayer and he will give us answers to the questions we ask of him.

c. *How long have you held the religious belief underlying your objection? What is the name of your religion and are you a member of a place of worship (church, synagogue, mosque, etc.)?*

I am a Christian that has been attending my church in Delaware for many years now. Not only do I attend but go to and lead bible studies and serve the church in many other volunteer capacities over these years from teaching kids church, helping with IT needs, Vacation Bible Study, etc.

d. *Please explain how the religious belief that prevents you from receiving the COVID-19 vaccine affects other areas of your life. For example, have you received other vaccines in the past? If so, please explain how your religious belief prevents you from getting the COVID-19 vaccine*

*but not other vaccines.*

Whenever I have major questions I always put them before God and trust that he knows what is best for me and will lead me to the right answer.

e. *Have you ever requested a religious accommodation previously, either on your own behalf or on behalf of a family member, such as a child who was subject to a school's vaccination requirements? If yes, please describe.*

N/A

29. Plaintiff provided the requested statements describing his sincerely held religious beliefs, practice, or observance and how the COVID-19 vaccination would violate his belief.

30. As the EEOC has made clear, "the employer should ordinarily assume that an employee's request for religious accommodation is based on a sincerely held religious belief." See https://www.eeoc.gov/laws/guidance/section-12-religious-discrimination.

31. The EEOC has held that, "[l]ike the religious nature of a belief, observance, or practice, the sincerity of an employee's stated religious belief is usually not in dispute and is "generally presumed or easily established." See https://www.eeoc.gov/laws/guidance/section-12-religious-discrimination

*citing Cf. Moussazadeh v. Tx. Dep't of Crim. Just.*, 703 F.3d 781, 790 (5th Cir. 2012) (case arising under Religious Land Use and Institutionalized Persons Act (RLUIPA)). However, Defendant again requested another statement from Plaintiff, which Plaintiff provided.

32. The second round of questions posed to Plaintiff (italicized), and Plaintiffs answers, are as follows:

a. *Please provide the name of your denomination or church and the number of years that you have been a member. Is there a website, reading, or letter from a religious leader you follow that we can review to learn more about your religious beliefs*?

As I have said in my previously submitted form, I am a Christian attending my church for many years now, over 10. The church can be found at sycamorehillchurch.org, the beliefs on the website are the church's and do not always match mine 100%.

b. *Please explain how the religious belief that prevents you from receiving the COVID-19 vaccine affects other areas of your life. For example, have you received vaccines or other medical treatment in the past? If so, please explain how your religious belief prevents you from getting the COVID-19 vaccine, but not other vaccines or medical treatment.*

As I have previously stated in my prior form: Whenever I have major

questions I always put them before God and trust that he knows what is best for me and will lead me to the right answer.

33. It is also noteworthy, that although Defendant's workers tested, wore masks and socially distanced throughout the Pandemic, neither masks nor social distancing were discussed as viable options prior to Plaintiff's termination. Furthermore, there are a multitude of lower cost tests available on the market that potentially could have been discussed as viable options but there are no facts to support that Defendant discussed these new tests, or the costs associated with these tests with Plaintiff.

34. Whether one subjectively feels the religious beliefs of others are bogus or illogical, it is their belief and the protections of the same has been enshrined in our constitutional structure since our country's inception, in fact, it is the quality upon which our nation was founded.

35. Critically, the Supreme Court once said, [i]t is among our Nation's proudest boasts that, "[i]f there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in [matters of] religion." *West Virginia State Bd. of Ed. v. Barnette*,319 U.S. 624, 642 (1943). Further, in this country, "religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit . . . protection." *Thomas v. Review Bd. of Ind. Employment Security Div*.,450 U.S.

707, 714 (1981)

36. Further, the High Court stated, [n]or is the free exercise of religion "limited to beliefs which are shared by all of the members of a religious sect." Id., at 715-716. Millions have fled to this country to escape persecution for their unpopular or unorthodox religious beliefs, attracted by America's promise that "[e]very citizen here is in her own country. To the protestant it is a protestant country; to the catholic, a catholic country; and the Jew, if he pleases, may establish in it her New Jerusalem." *People v. Phillips*, 1 W. L. J. 109, 112-113 (Gen. Sess., N.Y.1813), reported in W. Sampson, The Catholic Question in America 85 (1813). Further, the Court stated, "[t]he test of this Court's substance lies in its willingness to defend more than the shadow of freedom in the trying times, not just the easy ones." Dr. A v. Hochul, 21A145, 12 (U.S. Dec. 13, 2021).

37. Defendant's actions in this matter have been manifestly unreasonable and blatantly inconsistent with the duties imposed by law. Defendant simply failed to accommodate Plaintiff.

38. Defendant could have accommodated Plaintiff's religious beliefs without substantial costs (the new standard) or even *de minimis cost*, or undue hardship (indeed, with little cost whatsoever) if Plaintiff had just been routinely tested. Much as it had done before the vaccines were available and

while vaccines were available.

39. Thus, here, Defendants failed to fully engage in the interactive process[1] in good faith to legitimately consider all possible accommodations. This caused Defendants to overlook accommodations posing less than a substantial or de minimis burden including: (1) testing for COVID antibodies and acknowledging that Plaintiff's natural immunity satisfied Defendant's immunization requirements (because it is superior to vaccine-induced immunity); (2) weekly testing for COVID-19 (for which Plaintiff was willing to agree and which is a more reliable indication of safety than vaccination); (3) testing and masking when required to attend to patients; (something these nurses did all throughout the pandemic before the vaccines) or (4) any combination of the above.

40. In fact, it is baffling that the Defendants could not acknowledge that testing is a more reliable option since there is no evidence that taking a vaccine will prevent one from getting the virus, or from transmitting the virus.

41. In reality, at the time of Plaintiff's termination (April 29, 2022) the CDC had already conclusively stated that individuals vaccinated for COVID-19 could nevertheless contract and spread COVID-19. In fact, as early as March 29, 2021, the Director of the CDC, Rochelle Walensky, publicly stated that the

---

[1] Indeed, the process of interaction was always one-sided with Astra Zeneca asking questions which Plaintiff attempted to answer, yet when the Plaintiff asked questions, they would not answer his questions.

CDC's own data "suggests, you know, that vaccinated people do not carry the virus, don't get sick, and that it's not just in the clinical trials but it's also in real world data." However, because the real-world data already demonstrated breakthrough infections in the vaccinated just three (3) months after the Pfizer-BioNTech vaccine received FDA approval, the CDC immediately thereafter clarified Director Walensky's statements and confirmed that vaccinated individuals do in fact become infected and spread the virus to others. See CDC Reverses Statement by Director, (April 2, 2021), available at: https://thehill.com/changingamerica/well-being/546234-cdc-reverses-statement-by-director-that-vaccinated-people-are-no/.

42. Before instituting its vaccination policy, and frankly, because Defendants was a vaccine manufacturer outside the United States,[2] the Defendants knew, or should have known, that the vaccines were largely ineffective at controlling the spread of COVID-19. Critically, as early as July 2021, Director Walensky admitted that the vaccinated had similarly high viral loads of SARS-CoV-2 as the unvaccinated, and thus could still contract and spread the Delta variant. In fact, in August 2021 (two months prior to Plaintiff's termination) a joint study by the CDC and the Wisconsin Department of Health services further confirmed Director Walensky's admission. The study indicated that

---

[2] Astra Zeneca did not require vaccines for employees outside the US.

vaccinated individuals had a 5% higher viral load than the unvaccinated and were not only just as likely to transmit the virus as the unvaccinated but posed a greater contagion risk due to the increased likelihood of asymptomatic infection. Further, the CDC recognized that, in August of 2021, COVID-19 vaccines work "with regard to severe illness and death—they prevent it. But what they can't do anymore, if ever, is prevent transmission." Id. Further, because vaccinated individuals may also contract and transmit COVID-19, a negative COVID-19 test is a more reliable indication of safety from the virus than a vaccination at some earlier time. This fact was also well-known at the time Defendants  failed to accommodate Plaintiff and should have been considered as a reasonable accommodation to the vaccine mandate.

43. Further highlighting the irrationality of Defendants' continued pursuit of enforcing its mandate against employees, Defendants also refused to recognize natural immunity as satisfying its immunization requirement. This is even though the international scientific community had conclusively established through centuries of research that natural immunity is superior to vaccine-elicited immunity, See Plotkin's Vaccines, 7th Edition, at Section Once more, Defendants are a sophisticated healthcare provider and should have been aware of the fallacy of enforcing its vaccination policy in the context of undue hardship.

44. The Defendant wants this court to excuse its failure to accommodate although it is universally known that while the vaccine may prevent or reduce serious illness and death, it does not prevent transmission, or the contracting of COVID-19 or any of its variants.

45.  Plaintiff sought an exemption for religious reasons and Defendant simply and unilaterally denied his requests. It would not have been an undue hardship for the Defendant to have permitted Plaintiff to continue masking and social distancing as well as conducting testing, if need be, by sharing in the cost or by using testing that was less expensive. This is not an issue of undue hardship, substantial, or de minimis costs, as these options were not discussed, and Plaintiff's request for accommodation was summarily denied, in contravention of the law.

46. As the EEOC has made clear, "the employer should ordinarily assume that an employee's request for religious accommodation is based on a sincerely held religious belief." See https://www.eeoc.gov/laws/guidance/section-12-religious-discrimination.

## REASONABLE ACCOMODATION OPTIONS UNJUSTIFIABLY REJECTED BY DEFENDANT

47. The Defendant could have accommodated Plaintiff's sincere religious beliefs without undue hardship (indeed, with no cost whatsoever, if Plaintiff paid for testing). Defendant failed to engage in the interactive process to legitimately

consider all possible accommodations. This caused Defendant to overlook accommodations posing less than a substantial or even a *de minimis* burden including: (1) testing for COVID antibodies and acknowledging that Plaintiff's natural immunity satisfied Defendant's immunization requirements (because it is superior to vaccine-induced immunity); (2) weekly testing for COVID-19 (for which Plaintiff was willing to pay for and which is a more reliable indication of safety than vaccination); (3) testing/masking when required to attend an in-person meeting; or (4) any combination of the above.

48. At the time of Plaintiff's termination, the CDC had already conclusively stated that individuals vaccinated for COVID-19 could nevertheless contract and spread COVID-19. On March 29, 2021, the Director of the CDC Rochelle Walensky publicly stated that the CDC's own data "suggests, you know, that vaccinated people do not carry the virus, don't get sick, and that it's not just in the clinical trials but it's also in real world data."[3]

49. However, because the real-world data already demonstrated breakthrough infections in the vaccinated just three months after the Pfizer-BioNTech vaccine received FDA approval, the CDC immediately thereafter clarified

---

[3] Statement from CDC Director Rochelle P. Walensky, MD, MPH on Rachel Maddow Show (March 29, 2021), transcript available at: https://www.msnbc.com/transcripts/transcript-rachel-maddow-show-3-29-21-n1262442?utm_content=buffer7fb12&utm_medium=Arianna&utm_source=LinkedIn&utm_campaign=Buffer.

Director Walensky's statements and confirmed that vaccinated individuals do in fact become infected and spread the virus to others. *See* CDC Reverses Statement by Director, (April 2, 2021), available at: https://thehill.com/changingamerica/well-being/546234-cdc-reverses-statement-by-director-that-vaccinated-people-are-no/.

50. Before instituting its vaccination policy, Defendant knew or should have known that the vaccines were largely ineffective at controlling the spread of COVID-19. As early as July 2021, Director Walensky admitted that the vaccinated had similarly high viral loads of SARS-CoV-2 as the unvaccinated and thus could still contract and spread the Delta variant.[4]

51. In August 2021, a joint study by CDC and the Wisconsin Department of Health services further confirmed Director Walensky's admission. The study indicated that vaccinated individuals had a 5% higher viral load than the unvaccinated and were not only just as likely to transmit the virus as the

---

[4] *Statement from CDC Director Rochelle P. Walensky, MD, MPH on Today's MMWR*, CDC News Room (July 30, 2021), available at https://www.cdc.gov/media/releases/2021/s0730-mmwr-covid-19.html [https://perma.cc/VR5V-E67A] ("Today, some of those data were published in CDC's Morbidity and Mortality Weekly Report (MMWR), demonstrating that Delta infection resulted in similarly high SARSCoV-2 viral loads in vaccinated and unvaccinated people. High viral loads suggest an increased risk of transmission and raised concern that, unlike with other variants, vaccinated people infected with Delta can transmit the virus.").

unvaccinated but posed a greater contagion risk due to the increased likelihood of asymptomatic infection.[5]

52. Highlighting the irrationality of Defendant' continued pursuit of enforcing its mandate against religious employees, Defendant refused to recognize natural immunity as satisfying its immunization requirement. This is despite the fact that the international scientific community had conclusively established through centuries of research that natural immunity is superior to vaccine-elicited immunity. *See Plotkin's Vaccines*, 7th Edition, at Section 2.

53. Defendant is a sophisticated health care services provider and should have been aware of the fallacy of enforcing its vaccination Policy in the context of undue hardship and failed to even consider the religious beliefs of Plaintiff when determining whether it could exempt him.

54. Alternatively, periodic COVID-19 testing—or even testing when travel to offices was required—would have been a costless accommodation. As the CDC recognized in August of 2021, COVID-19 vaccines work "with regard to severe illness and death—they prevent it. But what they can't do anymore is prevent transmission."[6]

---

[5] *See* Kasen Riemersma, et. al, *Shedding of Infectious SARS-CoV-2 Despite Vaccination, medRxiv* (August 24, 2021), available at:
https://www.medrxiv.org/content/10.1101/2021.07.31.21261387v4.full.pdf.
[6] Statement by Rochelle Walensky, U.S. Centers for Disease Control, CNN Interview (Aug. 5, 2021), available at https://www.cnn.com/2021/08/05/health/us-coronavirus-thursday/index.html.

55. Because vaccinated individuals may also contract and transmit COVID-19, a negative COVID-19 test is a more reliable indication of safety from the virus than a vaccination at some earlier time. This fact was also well-known at the time Defendant failed to accommodate Plaintiff and should have been considered as a reasonable accommodation to the vaccine mandate.

56. Having Plaintiff wear a mask on the rare occasion he would have needed to meet someone in person was another possible reasonable accommodation. As even healthcare companies in the country have shown—including vaccine manufacturer Janssen (J&J)—religiously exempt employees may be accommodated without increased risk or cost through masking.

## APPLICABLE LAW

57. Title VII prohibits a Defendant from discriminating against employees based on their religion. 42 U.S.C. § 2000e-2(a)(1). This "include[s] all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate an employee's... religious observance or practice without undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j).

58. In other words, an employer must "make reasonable accommodation for the religious observances of its employees, short of incurring an undue hardship."

*Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 75 (1977)) see also *Groff v. DeJoy* 22-174, (2023).

59. This allows a Plaintiff to raise claims of religious discrimination under both a disparate treatment theory and a failure-to-accommodate theory. *Chalmers v. Tulon Co. of Richmond*, 101 F.3d 1012, 1018 (4th Cir. 1996).

60. Failure to engage in the interactive process to find a solution for an exempt employee " may not be an independent violation of Title VII, but as a practical matter, such failure can have adverse legal consequences [because] where an employer has made no effort to act on an accommodation request, courts have found that the employer lacked the evidence needed to meet its burden of proof to establish that the plaintiff's proposed accommodation would actually have posed an undue hardship." EEOC Guidance, *Section 12: Religious Discrimination*, Part 12-IV.A.2 (citing *EEOC v. Ithaca Indus., Inc.*, 849 F.2d 116, 118-19 (4th Cir. 1988) (finding that employer's failure to attempt to accommodate, absent any showing of undue hardship, violated Title VII)); *see also EEOC v. Arlington Transit Mix, Inc.*, 957 F.2d 219, 222 (6th Cir. 1991) ("After failing to pursue . . . any other reasonable accommodation, the company is in no position to argue that it was unable to accommodate reasonably [plaintiff's] religious needs without undue hardship on the conduct on its business.").

61. Title VII also prohibits a Defendant from retaliating against an employee for engaging in protected activity. *Fogleman v. Mercy Hosp., Inc*., 283 F.3d 561, 571 (3d Cir. 2002) see also, *Moore v. City of Philadelphia*, 461 F.3d 331, 341-42 (3d Cir. 2006) *Ferra v. Potter*, 324 F. App'x 189, 192 (3d Cir. 2009) ("As this Court has explained, '[w]ith respect to `protected activity,' the anti-retaliation provision of Title VII protects those who participate in certain Title VII proceedings . . . and those who oppose discrimination made un-lawful by Title VII. . . .'").

## FIRST CLAIM FOR RELIEF
## TITLE VII – RELIGIOUS DISCRIMINATION –
## FAILURE TO ACCOMMODATE
### (42U.S.C. § 2000e-2(a)(1))

62. Plaintiff incorporates herein by reference all preceding paragraphs.

63. An employee may assert a claim, for his employer's failure to accommodate, or continue accommodating an existing accommodation, of his sincere religious beliefs, so long as the accommodation does not impose undue hardship on the employer. *See Storey v. Burns Intern. Sec. Servs.,* 390 F.3d 760, 764 (3d Cir. 2004) ("…employer's failure to reasonably accommodate employee's religious beliefs that conflict with job requirements can amount to an adverse employment action unless employer can demonstrate such an accommodation results in 'undue hardship.'").

64. To establish a prima facie claim for failure to accommodate a plaintiff must present evidence that: "(1) he or she has a bona fide religious belief that conflicts with an employment requirement; (2) he or she informed the employer of this belief; and (3) he or she was disciplined for failure to comply with the conflicting employment requirement." *Wilkerson v. New Media,* 522 F.3d 315, 319 (3d Cir. 2008) ("To establish a prima facie case of a failure to accommodate claim, the employee must show: (1) she has a sincere religious belief that conflicts with a job requirement; (2) she told the employer about the conflict; and (3) she was disciplined for failing to comply with the conflicting requirement.") (*Quoting Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 75 (1977)).

65. Once the plaintiff has made out a prima facie case for discrimination, "the burden then shifts to the employer to show that it could not [reasonably] accommodate the plaintiff's religious needs without undue hardship." *Groff v. Dejoy,* 35 F.4th 162, 169 (3d Cir. 2022)[7].

66. Plaintiff clearly established his "bona fide religious belief" and its conflict with the Policy when he submitted his religious accommodation request to Defendant. Because Plaintiff could not receive the COVID-19 vaccine

---

[7] In *Groff v. DeJoy* 22-174, (2023), the U.S Supreme Court has clarified employers' obligations to accommodate employees' religious practices. The Court reinterpreted the meaning of "undue hardship" and held that Title VII requires an employer who denies a religious accommodation must show that the burden of granting an accommodation would result in "***substantial increased costs*** in relation to the conduct of its particular business." (Emphasis added).

without violating his religious beliefs, he could not comply with the Policy and was thus subject to adverse action by termination. While Defendant may now attempt to challenge Plaintiff's beliefs, it is not the employer's place to question or interpret an employee's religious beliefs, *Equal Employment Opportunity Commission v. Geo Group, Inc.,* 616 F.3d 265, 291 (3d Cir. 2010) ("An employer is not entitled to interpret the employee's religion and determine what is and is not religiously acceptable to them.").

67. Defendant chose to chill the Plaintiff's faith-based requests by telling him he would be terminated based on a deadline if he was not in compliance. Thereafter, Defendant terminated Plaintiff without engaging further in any interactive process to attempt to find workable accommodations that would not pose an undue hardship to the Defendant. Even if not a standalone claim, the failure to engage in a meaningful interactive process signals an employer's violation of its duty to accommodate because the employer is attempting to remain purposefully ignorant of potential reasonable accommodations.

68. To establish the defense of "undue hardship," Defendant must demonstrate that any aforesaid accommodations would "bear more than ***a substantial increased cost*** on the company. *Groff v. DeJoy* 22-174, (2023).

69. The above stated accommodation(s) required no additional cost or logistical burden to Defendant.

70. The ability to provide reasonable accommodations to employees such as Plaintiff is also evident by considering other companies similarly situated to Defendant—including countless hospitals and even COVID-19 vaccine manufacturers such as the Defendant and Janssen (J&J)—that were able to accommodate employees with religious based objections to mandatory COVID-19 vaccination policies. Defendant is thus without excuse as to why it failed also to follow federal employment law in this regard.

71. Title VII requires an employer to thoroughly consider all possible reasonable accommodations and not just reject requests out of hand with form denials. "If the accommodation solution is not immediately apparent, the employer should discuss the request with the employee to determine what accommodations might be effective."[8]

72. In the face of the reasonable options proposed here, Defendant cannot demonstrate even a *de minimis* burden in providing Plaintiff with accommodation.

73. To be sure, testing was a reasonable accommodation even for people physically entering the workplace—it is undisputed that someone cannot catch COVID-19 from someone who does not have COVID-19. And to the extent that Plaintiff would even need to be in contact with other employees, a

---

[8] EEOC Guidance Section 12: Religious Discrimination; Part IV, A.2.

negative COVID-19 test would have confirmed that he was less of a contagion hazard than untested individuals who were vaccinated at some earlier point in time but who could still contract and transmit COVID-19.

74. In denying Plaintiff's request, Defendant blankly asserted "significant undue hardship" and provided no justification as to why or how the several options available for accommodation were unable to be done without undue hardship.[9]

75. Moreover, the Defendant was on actual notice of both the many possible accommodation options for Plaintiff and the fact that the failure to continue using one or more of them would result in a Title VII violation. Nonetheless, Defendant forged forward with its campaign to deny accommodation and eliminate Plaintiff as an employee.

76. Therefore, Defendant unlawfully discriminated against Plaintiff based on his sincerely religious beliefs by failing to continue accommodating those beliefs. Defendant cannot demonstrate that doing so would have imposed any hardship whatsoever, let alone undue hardship.

**SECOND CLAIM FOR RELIEF**
**TITLE VII – RELIGIOUS DISCRIMINATION –**
**DISPARATE TREATMENT**
(42U.S.C. § 2000e-2(a)(1))

---

[9] In fact, Astra Zeneca gave some employees the option of continued testing when accommodations were granted.

77. Plaintiff incorporates herein by reference all preceding paragraphs.

78. Title VII also makes it unlawful for "an employer to discriminate against any of [its] employees . . . because he has opposed any practice made unlawful by this subchapter." 42 U.S.C. § 2000e-3(a). 116. A prima facie case for retaliation requires a showing "that (1) she engaged in activity protected by Title VII; (2) that an adverse employment action was taken by the employer; and (3) that a causal link existed between the protected activity and the adverse action." *Ortiz v. Delta Dental of Pa.,* Civil No. 1:18-CV-456, at *11 (M.D. Pa. May 13, 2020).

79. Here, Plaintiff engaged in protected activity under Title VII when he sought a religious accommodation from the Policy that would otherwise require him to violate his sincere religious beliefs.

80. Then, because of his request for accommodation, Defendant subjected Plaintiff to its sham process in violation of federal law.

81. Defendant never intended to accommodate Plaintiff. As a result, he was forced from his employment.

82. Were it not for Plaintiff's religious beliefs and his request for accommodation, he would not have been subjected to such treatment.

83. Further, Defendant hoped that the constant reminder of termination would result in Plaintiff abandoning his religious beliefs and surrendering to a coerced injection of a COVID-19 vaccine.

84. Defendant's Policy forced those who were denied religious accommodations into a period of extreme emotional and psychological distress, seeking to coerce religious employees into compliance.

85. But for his request for religious accommodation, Plaintiff would not have experienced the psychological and emotional distress from being constantly pressured to violate his beliefs.

86. Defendant also terminated Plaintiff for seeking a religious accommodation to its compulsory vaccination policy. Plaintiff maintained his request for accommodation through the date of his termination.

87. Separately, Defendant refused to admit its mistake and bring Plaintiff back even after it became apparent that (1) accommodations were available; (2) the COVID-19 vaccines were not preventing contraction of the virus; and (3) individuals with natural immunity possessed superior immunity to those with the vaccine only. Such actions were due to Plaintiff's opposition to Defendant' illegal employment practice. The company had made up its mind to purge as many unvaccinated religious employees as it believed it could and the position against those seeking accommodations had become entrenched.

## THIRD CLAIM FOR RELIEF
## TITLE VII – RETALIATION – OPPOSITION CLAUSE
(42 U.S.C. §2000e-3(a))

88. Plaintiff incorporates herein by reference all preceding paragraphs.

89. Title VII also makes it unlawful for "an employer to discriminate against any of [its] employees . . . because he has opposed any practice made unlawful by this subchapter." 42 U.S.C. § 2000e-3(a).

90. A *prima facie* case for retaliation requires showing "(1) he engaged in activity protected by Title VII; (2) that an adverse employment action was taken by the employer; and (3) that a causal link existed between the protected activity and adverse action." *Ortiz,* Civil No. 1:18-CV-456, at *11.

91. Here, Plaintiff engaged in protected activity under Title VII when he sought a religious accommodation from the Policy that would otherwise require him to violate his sincere religious beliefs. Plaintiff continued to oppose Defendant's unlawful practice through his formal termination.

92. Then, because of his request for accommodation, Defendant subjected Plaintiff to its process to coerce him from exercising his rights under federal law. Defendant's Policy was not designed to look for reasonable accommodation for Plaintiff because Defendant never intended to fully accommodate Plaintiff. Were it not for Plaintiff's beliefs and his request for accommodation, he would not have been subjected to such treatment.

93. After denying Plaintiff's request, and Plaintiff's opposition thereto, Defendant pressured him to capitulate and get the COVID-19 vaccine with false information that Defendant could not accommodate his beliefs.

94. Defendant imposed deadlines with the intent to punish those who sought religious accommodation; hoping that the constant reminder of termination would result in them abandoning their religious beliefs and surrendering to a coerced injection of a COVID-19 vaccine.

95. Defendant's Policy forced those who were denied religious accommodations or placed in temporary accommodations with the caveat of impending termination, into a period of extreme emotional and psychological distress, seeking to coerce religious employees into compliance.

96. But for his request for religious accommodation, Plaintiff would not have experienced the psychological and emotional distress from the period of temporary accommodation where he was constantly pressured to violate his religious beliefs.

97. Defendant also terminated Plaintiff for seeking a religious accommodation to its compulsory vaccination Policy. Plaintiff maintained his request for accommodation through the date of his termination. Defendant terminated Plaintiff in close temporal proximity to his requesting religious accommodation and/or seeking continued accommodations.

98. Separately, Defendant refused to admit its mistake and bring Plaintiff back even after it became apparent that (1) accommodations were available; (2) the COVID-19 vaccines were not preventing contraction of the virus; and (3) individuals with natural immunity possessed superior immunity to those with the vaccine only. Such actions were due to Plaintiff's opposition to Defendant' illegal employment practice.

99. The Defendant had made up its mind to purge as many unvaccinated religious employees as it believed it could and the position against those seeking accommodations had become entrenched.

100. Defendant's actions in forcing those denied accommodation as sought into temporary accommodation just to terminate them after an arbitrarily specified period constitutes retaliation in violation of Title VII.

## FOURTH CLAIM FOR RELIEF
## PHRA – RELIGIOUS DISCRIMINATION – FAILURE TO ACCOMMODATE

101. Plaintiff incorporates herein by reference all preceding paragraphs.

102. An employee may assert a claim, for his employer's failure to accommodate, or continue accommodating an existing accommodation, of his sincere religious beliefs, so long as the accommodation does not impose undue hardship on the employer. *See Storey v. Burns Intern. Sec. Servs.,* 390 F.3d 760, 764 (3d Cir. 2004) ("An employer's failure to reasonably

accommodate an employee's sincerely held religious belief that conflicts with a job requirement can also amount to an adverse employment action unless the employer can demonstrate that such an accommodation would result in 'undue hardship.'").

103.     To establish a prima facie claim for failure to accommodate a plaintiff must present evidence that: "(1) he or she has a bona fide religious belief that conflicts with an employment requirement; (2) he or she informed the employer of this belief; and (3) he or she was disciplined for failure to comply with the conflicting employment requirement." *Wilkerson v. New Media,* 522 F.3d 315, 319 (3d Cir. 2008) ("To establish a prima facie case of a failure to accommodate claim, the employee must show: (1) she has a sincere religious belief that conflicts with a job requirement; (2) she told the employer about the conflict; and (3) she was disciplined for failing to comply with the conflicting requirement.") (*Quoting Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 75 (1977)).

104.     Once the plaintiff has made out a prima facie case for discrimination, "the burden then shifts to the employer to show that it could not [reasonably] accommodate the plaintiff's religious needs without undue hardship." *Groff v. Dejoy,* 35 F.4th 162, 169 (3d Cir. 2022).

105.    Plaintiff clearly established his "bona fide religious belief" and its conflict with the Policy when he submitted his religious accommodation request to Defendant. Because Plaintiff could not receive the COVID-19 vaccine without violating his religious beliefs, he could not comply with the Policy and was thus subject to adverse action by termination. While Defendant may now attempt to challenge Plaintiff's beliefs, it is not the employer's place to question or interpret an employee's religious beliefs, *Equal Employment Opportunity Commission v. Geo Group, Inc.,* 616 F.3d 265, 291 (3d Cir. 2010) ("An employer is not entitled to interpret the employee's religion and determine what is and is not religiously acceptable to them.").

106.    Defendant chose to chill the Plaintiff's faith-based requests by telling him he would be terminated based on a deadline if he was not in compliance. Thereafter, it terminated Plaintiff without engaging further in any interactive process to attempt to find workable continuing accommodation that would not pose an undue hardship to the company. Even if not a standalone claim, the failure to engage in a meaningful interactive process signals an employer's violation of its duty to accommodate because the employer is attempting to remain purposefully ignorant of potential reasonable accommodations.

107.     To establish the defense of "undue hardship," Defendant must demonstrate that any of the aforesaid accommodations would "bear more than a *de minimis* cost" on the company. *Hardison*, 432 U.S. at 84 superseded by *Groff,* 35 F.4th at 169. The above stated accommodations required no additional cost or logistical burden to Defendant, as was seen when the company brought back and accommodated numerous employees from around the country who also held sincere religious beliefs that prevented them from taking the vaccine. Defendant also provided accommodation with remote work, albeit temporary. How then was it an undue hardship to continue accommodating what it had already accommodated.

108.     The ability to provide reasonable accommodations to employees such as Plaintiff is also evident by considering other companies similarly situated to Defendant—including countless hospitals and even COVID-19 vaccine manufacturers such as the Defendant and Janssen (J&J)—that were able to accommodate employees with religious based objections to mandatory COVID-19 vaccination policies. Defendant is thus without excuse as to why it failed also to follow federal employment law in this regard.

109.     The PHRA requires an employer to thoroughly consider all possible reasonable accommodations and not just reject requests out of hand with form denials. "If the accommodation solution is not immediately apparent, the

33

employer should discuss the request with the employee to determine what accommodations might be effective."[10]

110.     Such accommodation might include things such as telework, which the Plaintiff conducted here for the Defendant. In the face of the reasonable options proposed here, Defendant cannot demonstrate even a substantial or *de minimis* burden in providing Plaintiff with accommodation.

111.     To be sure, testing was a reasonable accommodation even for people physically entering the workplace—it is undisputed that someone cannot catch COVID-19 from someone who does not have COVID-19. And to the extent that Plaintiff would even need to be in contact with other employees, a negative COVID-19 test would have confirmed that he was less of a contagion hazard than untested individuals who were vaccinated at some earlier point in time but who could still contract and transmit COVID-19.

112.     In denying Plaintiff's request, Defendant blankly asserted "significant undue hardship" and provided no justification as to why or how the several options he proposed (and were clearly available as it had so accommodated his, i.e., remote work) were unable to be done without undue hardship. This is especially true where recognition of Plaintiff's natural immunity and/or

---

[10] EEOC Guidance Section 12: Religious Discrimination; Part IV, A.2 as applicable to the PHRA.

continued isolation (for example) required no cost, effort, or operational change to the status quo.

113.     Moreover, the Defendant was on actual of notice both the many possible accommodation options for Plaintiff (as it had provided some) and the fact that the failure to continue using one or more of them would result in a Title VII violation. Nonetheless, Defendant forged forward with its campaign to eliminate its religious employees, including Plaintiff.

114.     Therefore, Defendant unlawfully discriminated against Plaintiff based on his sincerely religious beliefs by failing to continue accommodating those beliefs. Defendant cannot demonstrate that doing so would have imposed any hardship whatsoever, let alone undue hardship.

## FIFTH CLAIM FOR RELIEF
## PHRA – RELIGIOUS DISCRIMINATION –
## DISPARATE TREATMENT

115.     Plaintiff incorporates herein by reference all preceding paragraphs.

116.     The PHRA also makes it unlawful for "an employer to discriminate against any of [its] employees . . . because he has opposed any practice made unlawful by the PHRA. A prima facie case for retaliation requires a showing "that (1) she engaged in activity protected by Title VII (applicable also to the PHRA; (2) that an adverse employment action was taken by the employer; and (3) that a causal link existed between the protected activity and the

adverse action." *Ortiz v. Delta Dental of Pa.,* Civil No. 1:18-CV-456, at \*11 (M.D. Pa. May 13, 2020).

117.    Here, Plaintiff engaged in protected activity under the PHRA when he sought religious accommodation from the Policy that would otherwise require him to violate his sincere religious beliefs.

118.    Then, because of his request for accommodation, Defendant subjected Plaintiff to its sham process in violation of federal law.

119.    Defendant never intended to accommodate Plaintiff, or anyone else. As a result, he was forced from his employment.

120.    Were it not for Plaintiff's religious beliefs and his request for accommodation, he would not have been subjected to such treatment.

121.    Further, Defendant hoped that the constant reminder of termination would result in Plaintiff abandoning his religious beliefs and surrendering to a coerced injection of a COVID-19 vaccine.

122.    Defendant's Policy forced those who were denied religious accommodations into a period of extreme emotional and psychological distress, seeking to coerce religious employees into compliance.

123.    But for his request for religious accommodation, Plaintiff would not have experienced the psychological and emotional distress from the period of unpaid leave where he was constantly pressured to violate his beliefs.

124.     Defendant also terminated Plaintiff for seeking a continued religious accommodation to its compulsory vaccination policy. Plaintiff maintained his request for accommodation through the date of his termination.

125.     Separately, Defendant refused to admit its mistake and bring Plaintiff back even after it became apparent that (1) accommodations were available; (2) the COVID-19 vaccines were not preventing contraction of the virus; and (3) individuals with natural immunity possessed superior immunity to those with the vaccine only. Such actions were due to Plaintiff's opposition to Defendant' illegal employment practice. The company had made up its mind to purge as many unvaccinated religious employees as it believed it could and the position against those seeking accommodations had become entrenched.

126.     Defendant' actions forced those denied accommodation onto temporary accommodation just to terminate them after an arbitrary specified period, and then not bringing them back when it was possible constitutes retaliation in violation of Title VII.

**SIXTH CLAIM FOR RELIEF**
**PHRA – RETALIATION – OPPOSITION CLAUSE**

127.     Plaintiff incorporates herein by reference all preceding paragraphs.

128.      The PHRA also makes it unlawful for "an employer to discriminate against any of [its] employees . . . because he has opposed any practice made unlawful by the PHRA.

129.     A *prima facie* case for retaliation requires a showing "that (1) he engaged in activity protected by Title VII (applicable also to the PHRA); (2) that an adverse employment action was taken by the employer; and (3) that a causal link existed between the protected activity and the adverse action." *Ortiz,* Civil No. 1:18-CV-456, at *11.

130.     Here, Plaintiff engaged in protected activity under the PHRA when he sought a religious accommodation from the Policy that would otherwise require him to violate his sincere religious beliefs. Plaintiff continued to oppose Defendant's unlawful practice through his formal termination.

131.     Then, because of his request for accommodation, Defendant subjected Plaintiff to its process to coerce him from exercising his rights under federal law. Defendant's Policy was not designed to look for reasonable accommodation for Plaintiff because Defendant never intended to fully accommodate Plaintiff. Were it not for Plaintiff's beliefs and his request for accommodation, he would not have been subjected to such treatment.

132.     After denying Plaintiff's request, and Plaintiff's opposition thereto, Defendant pressured him to capitulate and get the COVID-19 vaccine with false information that Defendant could not continue accommodating his beliefs with remote work.

133.    Defendant imposed deadlines with the intent to punish those who sought religious accommodation; hoping that the constant reminder of termination would result in them abandoning their religious beliefs and surrendering to a coerced injection of a COVID-19 vaccine.

134.    Defendant's Policy forced those who were denied religious accommodations or placed in temporary accommodations with the caveat of impending termination, into a period of extreme emotional and psychological distress, seeking to coerce religious employees into compliance.

135.    But for his request for religious accommodation, Plaintiff would not have experienced the psychological and emotional distress from the period of temporary accommodation where he was constantly pressured to violate his religious beliefs.

136.    Defendant also terminated Plaintiff for seeking a religious accommodation to its compulsory vaccination Policy. Plaintiff maintained his request for accommodation through the date of his termination. Defendant terminated Plaintiff in close temporal proximity to his requesting religious accommodation and/or seeking continued accommodations.

137.    Separately, Defendant refused to admit its mistake and bring Plaintiff back even after it became apparent that (1) accommodations were available; (2) the COVID-19 vaccines were not preventing contraction of the virus; and

(3) individuals with natural immunity possessed superior immunity to those with the vaccine only. Such actions were due to Plaintiff's opposition to Defendant' illegal employment practice. The company had made up its mind to purge as many unvaccinated religious employees as it believed it could and the position against those seeking accommodations had become entrenched. Defendant's actions in forcing those denied accommodation as sought into temporary accommodation just to terminate them after an arbitrarily specified period constitutes retaliation in violation of the PHRA.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that this Court:

(a)     Declare Defendant violated Title VII and the PHRA by failing to engage in the interactive process and to accommodate in response to Plaintiff's request for religious accommodations to its Policy and, instead, preemptively denying his request based on pretextual reasons.

(b)     Accordingly, declare Defendant violated Title VII and the PHRA for its failure to provide reasonable accommodation and disparately treated Plaintiff to his clearly articulated religious beliefs when numerous no-cost options or non-substantial costs were available.

(c)     Declare that Defendant violated Title VII and the PHRA by retaliating against Plaintiff for engaging in protected activity through seeking religious accommodation and opposing unlawful measures taken by the Defendant to prevent him from seeking accommodation.

(d)     Award Plaintiff damages, including back pay, front pay, pre-judgment and post-judgment interest, punitive damages (as to Title VII) and compensatory damages and other affirmative relief necessary to eradicate the effects of Defendant' unlawful employment practices.

(e)     Award Plaintiff damages necessary to make him whole by providing compensation for past and future pecuniary losses resulting from the unlawful employment practices described above, including emotional pain, suffering, inconvenience, loss of enjoyment of life, humiliation, and loss of civil rights, in an amount determined at trial.

(f)     Award reasonable attorney fees and costs; and

(g)     Award such other and further relief that this Court may deem just and equitable.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff hereby respectfully demands trial by jury on all counts so triable.

DATED this the 8th Day of October, 2023.

*By: /s/ Jeremy A. Donham, Esquire*
Jeremy Donham, (206980)
**DONHAM LAW**
714 Venture Drive, Ste. 144
Morgantown, West Virginia 26508
717.881.7855 (Phone)
Email: J.Donham@Donhamlaw.com

Jesse C. Markley (315758)
**MARKLEY LAW FIRM LLC**
1350 Woodridge Dr.
Middletown, PA 17057
717.376.8403 (Phone)
Email: MarkleyLawFirm@gmail.com

Charles J. Hobbs (209321)
**THE HOBBS LAW FIRM**
256 E. Market Street
York, PA 17403
717.793-2398 (Phone)
Email: chobbs@thehobbslawfirm.com

*Collaborative Co-Counsel for Plaintiff*